DREW, J.
Lin this suit arising out of an incident in which an assistant principal/disciplinarian was injured when she was tripped by a second-grade student, the assistant principal/disciplinarian appeals judgments dismissing her' claims against the student’s parents.
We reverse the judgment dismissing the claims against the father and his insurer, and affirm the judgment dismissing the claims against the mother.
FACTS
“MAC,” the child at the center of this lawsuit, was born in November of 2002. He attended Evangel Christian Academy through most of first grade before being expelled because of disobedience. He was then enrolled at Summer Grove Elementary School in Shreveport near the end of first grade to finish out the 2009-2010 school year.
MAC had an extensive disciplinary record at Summer Grove during the first few months of the 2010-2011 school year. On September 9, MAC told two classmates that he would kill them at recess. On September 14, MAC was accused of cursing at another student. When his teacher told him to get off the floor and return to his chair, MAC began to crawl around the class and tried to hit another student with a pencil. MAC also threw his work on the ground and refused to go to recess. The next day, MAC told other students he was going to kill them. He also pulled and tugged away from a teacher when she told him to comply with her command to stand by a wall at recess. MAC received a suspension for his actions. MAC was' admitted to Brentwood Hospital following the incidents of September 15. |2He was diagnosed at Brentwood as being bipolar.[1] MAC was discharged from Brentwood on September 27.
MAC returned to Summer Grove, and on September 29, he told a teacher that he *946 could kill her because he knew jujitsu. Later that same day, MAC hit another student with pencils and chased the student around the classroom. MAC was suspended for threatening the teacher.
On October 5, 2010, MAC punched one student in the chest and then hit another student while swinging a jacket, stole another student’s erasers and a dollar from another student, and put his middle finger up at students in class.
On October 6, 2010, MAC threw and kicked chairs around the classroom, hit and kicked at an ISS teacher in the classroom, and kicked his teacher. He also screamed profane language in the classroom. MAC was suspended and referred to the child welfare officer. A hearing was also held after this incident. Kamithia Penton, the assistant principal and disciplinarian at Summer Grove, urged Principal Pamela Bloomer to remove MAC from the school because she considered MAC to be a danger to other students and staff. Bloomer decided that MAC should remain at Summer Grove because there were no alternative school options for him at his age.
On November 3, 2010, MAC pushed his teacher against a classroom locker. Pen-ton went to the classroom to escort MAC to the school office. On the way to the office, MAC tripped Penton, causing her to sustain injuries. MAC was moved to another school following this incident.
| ^Procedural History
MAC’S parents, Michael Castellano (“Michael”) and Kelly Castellano Hudson (“Kelly”), were divorced at the time of the incident. Penton filed suit against Michael as domiciliary parent and natural tutor, Kelly as natural tutrix, Bloomer, and the Caddo Parish School Board.[2] La. C.C. art. 2318 was asserted as the basis for the parents’ liability.
Michael filed exceptions of no cause of action and no right of action on the ground he owed no duty to Penton at the time of the incident because Summer Grove had assumed a duty with respect to MAC, who was under their sole supervision and control.
Kelly filed a motion for summary judgment. She asserted that Michael was the sole custodial parent at the time of the incident as she had only visitation rights pursuant to a series of interim orders and amendments. She contended that liability under La. C.C. art. 2318 attached only to the custodial parent, and as the noncustodial parent, she could not be held liable for her son’s actions under art. 2318.
Penton amended her petition to add State Farm as a defendant in its capacity as the insurer, under separate policies, of Michael and Kelly.
Michael and State Farm filed a motion for summary judgment in which they contended that the missing element in Pen-ton’s claim against them was a duty on the part of Michael. They argued that while parents are normally responsible for the negligent conduct of their children under La. C.C. art. 2318, the school board and faculty and staff at Summer Grove ^assumed the duty to educate and supervise MAC, whom they knew had a mental illness. They further argued that Penton’s role as assistant principal and disciplinarian was analogous to that of a compensated caregiver.
The trial court rendered a judgment granting Kelly’s motion for summary judgment, as well as a judgment granting Michael’s motion for summary judgment and exception of no right of action.
*947 Penton applied for supervisory writs with this court, which noted that the judgments were final judgments subject to appeal, and the notice of intent to seek writs was timely as an appeal. The matter was remanded to the trial court for perfection of the appeal.
DISCUSSION
The asserted basis for the parents’ liability for the acts committed by MAC is found in La. C.C. art. 2318, which provides:
The father and the mother are responsible for the damage occasioned by their minor child, who resides with them or who has been placed by them under the care of other persons, reserving to them recourse against those persons. However, the father and mother are not responsible for the damage occasioned by their minor child who has been emancipated by marriage, by judgment of full emancipation, or by judgment of limited emancipation that expressly relieves the parents of liability for damages occasioned by their minor child.
This is legally imposed strict liability, and fault is determined regardless of whether the parent could or could not have prevented the child’s act. Turner v. Bucher, 308 So.2d 270 (La.1975). The liability can be escaped when a parent shows the harm was caused by the fault of the victim or of a third person, or by a fortuitous event. Id.

|,4⅝ielly’s liability

Penton appeals the granting of summary judgment in favor of Kelly, dismissing all claims against her. A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880. A summary judgment is reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate, ie., whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. Id.
In order to review the granting of summary judgment, it is first necessary to recount the history of the parents’ divorce and custody action. Michael filed a petition for divorce on February 6, 2006. He sought sole custody with Kelly being given restricted and supervised visitation. An interim order was entered on March 27, 2006, granting Michael interim custody of MAC subject to Kelly’s restricted and supervised overnight visitation every other weekend pending trial on a rule that was set for the following month.
Kelly filed an answer and reconventional demand in the divorce action on April 11, 2006. Kelly prayed .that she and Michael be awarded shared custody of MAC and that they be designated as co-domiciliary parents. A second interim order was entered on August 16, 2006, appointing a mental health professional.
|fiKelly and Michael apparently worked out a visitation agreement on their own. On April 14, 2009, Kelly filed a petition to terminate the interim order and establish joint custody with herself named domiciliary parent and reasonable visitation given to Michael. Kelly asserted that beginning in April of 2007, Michael allowed her to have custody of MAC for two days a week unsupervised. She further stated that beginning in April of 2008, she picked up MAC from school every day and kept him at her home until Michael got off work. During the summer, she kept MAC when Michael was at work. She also had MAC for an overnight visit during the week when she did not have weekend visitation. *948 Kelly contended that in February of 2009, Michael told her that she would receive only the visitation provided in the interim order.
On May 15, 2009, Michael filed a petition to amend the interim order. He admitted that he had recently allowed Kelly to have unsupervised visitation with MAC. However, after he told her that future visitation would have to be supervised in accordance with the interim order, she continued to have unsupervised visitation with her son. Accordingly, Michael sought the modification of the interim order to suspend the exercise of custodial periods by Kelly pending substitution of an appropriate supervisor or an interim recommendation by the appointed mental health professional.
An amended interim order was entered on June 3, 2009, prohibiting overnight visits by members of the opposite sex during any period of |7physical custody of MAC. All other provisions of the original interim order remained in full force and effect.
A second amended interim order was entered on August 11, 2009. It provided for Kelly’s unsupervised visitation with MAC every other weekend and every Wednesday. All prior orders except as modified were to remain in full force and effect. It stated that trial was set for September 29, 2009. There have been no further judicial actions regarding custody, and the parents have not obtained a final custody determination because, according to Michael, Kelly has abided by the existing interim order.
Penton argues that because legal custody of MAC is unresolved without a final determination of custody, both parents remained strictly liable under La. C.C. art. 2818 for the delictual acts of MAC at Summer Grove. Penton contends that the interim orders cannot bar recovery against Kelly under art. 2818 as both parents continue to have legal custody. She insists the interim orders are nothing more than agreements in the form of consent judgments that maintain the status quo of physical custody.
Kelly counters that the interim orders granted her visitation rights, but no custody rights. Since she was never granted custody rights, and none were taken from Michael, he remained the sole custodial parent on November 3, 2010. Kelly urges that the award of custody to Michael in the interim orders disrupted her parental authority and precluded imposing liability against her under art. 2318.
Penton cites Henderson v. Sellers, 2001-0529 (LaApp. 3d Cir.12/5/01), 815 So.2d 853, in support of her argument. There, the parents |8were granted joint custody with the father named as domiciliary parent. The custody plan contained a provision that responsibility for the acts of the children, including those acts contemplated in art. 2318, were to be borne by the parent in custody at the time of the act. As determined by the court on motion for summary judgment, the child was in the physical custody of his mother at the time he was involved in a fight.[3] The appellate court concluded that while the responsibility provision was valid between the parents, it could not eviscerate the rights of an injured third party.
Henderson v. Sellers can be distinguished as joint custody had been awarded in that matter, whereas the interim orders awarded custody to Michael with visitation rights given to Kelly. Moreover, Kelly is not seeking to enforce the terms of an *949 agreement specifically regarding art. 2318 liability, but is instead relying on the order of the court that provided her only with visitation.
The importance of legal custody versus where a child resided was examined in Audubon Ins. Co. v. Fuller, 430 So.2d 343 (La.App. 3d Cir.1983). The judgment of divorce granted custody to the mother with the father having visitation and custody during his vacation. At the time of the tort, the child was living with his father. The court noted that after a judgment of divorce, only the parent with legal custody of the child can be liable under La. C.C. art. 2318 for the child’s tortious acts. The court also noted that it was not enough to impose liability on the father under art. 2318 merely because the child was living with him at the time of the incident. 19The responsibility of the custodial parent under art. 2318 remained fixed, and the parental responsibility of the noncustodial parent under art. 2318 had been suspended by the force and effect of law, regardless of where the child actually resided. The court concluded that summary judgment was inappropriate because, recognizing the divided custody provisions in the decree, it remained a genuine issue of material fact whether the father had legal custody at the time of the incident.
Michael stated that he, not Kelly, made the decisions regarding MAC following their divorce. Michael was the parent who met with Penton and Bloomer when MAC first started at Summer Grove. Michael was called to the school after MAC’S incidents, although it appears that Kelly may have participated in some of the meetings with Summer Grove’s staff.
It is of no importance that there had not been a final custody determination. In Wilde v. McMilleon, 513 So.2d 551 (La.App. 2d Cir.1987), the mother obtained custody of the children in a judgment of separation rendered in Morehouse Parish. A judgment of divorce subsequently rendered in Arkansas did not mention custody. The original judgment on rule for custody was never modified, and it was not abrogated by the Arkansas divorce decree, so custody remained with the mother. The father correctly contended that he was not vicariously liable under art. 2318 for his son’s tort. The court concluded that the award of custody to the mother had disrupted the father’s parental authority and liability under art. 2318.
ImBased upon our de novo review of this record, we conclude that the trial court did not err in granting Kelly’s motion for summary judgment.

Michael’s liability

Penton also appeals the judgment granting Michael’s exception of no right of action and motion for summary judgment. Michael notes that the judgment which his attorney prepared should have read that both exceptions were granted along with his motion for summary judgment. However, he acknowledges that the motion for summary judgment essentially tracked both exceptions.
The exception of no cause of action and the exception of no right of action both present questions of law. Therefore, a court conducts a de novo review of the trial court’s action on these exceptions. Waggoner v. America First Ins., 42,863 (La.App.2d Cir.1/16/08), 975 So.2d 110.
Our supreme court has explained the difference between the exceptions of no cause of action and no right of action:
Although these two exceptions are often confused or improperly combined with the same exception, the peremptory exceptions of no right of action and no cause of action are separate and distinct. This court has recognized that one of the primary differences between the ex *950 ception of no right of action and no cause of action lies in the fact that the focus in an exception of no right of action is on whether the particular plaintiff has a right to bring the suit, while the focus in an exception of no cause of action is on whether the law provides a remedy against the particular defendant.
The function of an exception of no right of action is a determination of whether plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the petition. The exception of no right of action serves to question whether the plaintiff in the particular case is a member of the class of persons that has a legal interest in the subject matter of the litigation.
11TIn contrast, an exception of no cause of action questions whether the law extends a remedy against the defendant to anyone under the factual allegations of the petition. The exception is triable on the face of the petition and, to determine the issues raised by the exception, each well-pleaded fact in the petition must be accepted as true. In reviewing a district court’s ruling sustaining an exception of no cause of action, appellate courts conduct a de novo review because the exception raises a question of law and the district court’s decision is based only on the sufficiency of the petition. An exception of no cause of action should be granted only when it appears beyond doubt that the plaintiff can prove no set of facts in support of any claim which would entitle him to relief. If the petition states a cause of action on any ground or portion of the demand, the exception should generally be overruled. Every reasonable interpretation must be accorded the language used in the petition in favor of maintaining its sufficiency and affording the plaintiff the opportunity of presenting evidence at trial.
Citations omitted. Badeaux v. Southwest Computer Bureau, Inc., 2005-0612 at pp. 6-7 (La.3/17/06), 929 So.2d 1211, 1216-7.
Michael contends that strict liability is not applicable in this matter because Penton was contractually obligated to care for MAC, and she was well aware of his behavioral problems. He argues that what is missing in Penton’s claim is a duty on his part under these circumstances since Summer Grove assumed a duty to educate and supervise MAC. Michael contends that the facts are not in dispute and whether the school board assumed a duty with respect to MAC is a legal issue.
Michael also points out that instead of waiting for the security coordinator to arrive and assist with MAC, Penton elected to escort him to the office alone. In addition, she could have also called Michael, who had come to school promptly in the past when called, and waited for him to arrive at the school before proceeding with MAC. Michael contends that either step would have helped prevent the injury that occurred. Michael |12argues that, like a compensated caregiver, Penton is not within the class of individuals who should be allowed to recover under these circumstances.
Penton counters that Michael failed to establish that Penton was outside the class of individuals who were legally entitled to assert a claim for his liability under art. 2318 for MAC’S actions. She argues that summary judgment was inappropriate as custody never shifted from Michael to the school. Michael did not lose responsibility for MAC’S actions while he was at school. In addition, Penton argues that she did not fall under any caregiver rule because she was not hired to guard against the danger of being injured by MAC, and she was not there to take care of MAC’S health needs.
In support of his arguments, Michael cites Griffin v. Shelter Ins. Co., 2002-2628 *951 (La.App. 1st Cir.9/26/03), 857 So.2d 603, writ denied, 2003-2992 (La.1/16/04), 864 So.2d 635; Thibo v. Aetna Ins. Co., 347 So.2d 20 (La.App. 3d Cir.1977), writ denied, 350 So.2d 674 (La.1977); and Vinccinelli v. Musso, 2001-0557 (La.App. 1st Cir.2/27/02), 818 So.2d 163, writ denied, 2002-0961 (La.6/7/02), 818 So.2d 767.
The plaintiff in Griffin was hired to care for a totally disabled, elderly woman. She was injured when the elderly woman grabbed her arm while being transferred from her wheelchair. The court noted that the risk of the elderly woman grabbing Griffin’s arm while being transferred from her wheelchair was the type of risk that Griffin was contractually obligated to guard against. That particular risk of harm was not unreasonable for Griffin considering her job responsibilities, and under the facts and circumstances, 11sno duty was owed by the elderly woman to Griffin to guard against that particular risk.
In Thibo, a family’s housekeeper was injured while trying to dress their three-year-old developmentally disabled son. The trial court found that based on Turner v. Bucher, supra, the parents were strictly liable for the injuries caused by their son. The Third Circuit reversed, holding that Turner did not apply and the parents were not liable under art. 2318. The court noted that the housekeeper, who had been employed by the family for more than six months, knew of the child’s propensities to struggle with her while she was caring for him.
In Vinccinelli, the court determined that an Alzheimer’s patient owed no duty to her caregiver to protect her from slipping in ice cream on the kitchen floor at the patient’s home.
All three cases cited for support by Michael can be readily distinguished. The basis for the court’s holding in Thibo was that the housekeeper was barred from recovery under assumption of the risk. However, assumption of a risk no longer acts as a complete bar to recovery. See Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988). The plaintiffs in Griffin and Vinccinelli were specifically hired to care for the infirm. MAC was at Summer Grove to receive an education. While Pen-ton obviously looked out for MAC’s well-being, taking care of his health needs was not her primary function. She was not MAC’S caretaker.
In Nalle v. State Farm Fire & Cas. Co., 97-441 (La.App. 3rd Cir.10/8/97), 702 So.2d 854, writ denied, 97-2832 (La.2/13/98), 706 So.2d 994, a teacher was injured when her student, who had been assigned the task of holding the classroom door open while the class exited the room, suddenly turned around and dashed toward the classroom, when he collided with the teacher. The court rejected the argument of the. student’s parents that they should not be held responsible for the teacher’s injuries because they had entrusted the care, custody, and supervision of their child to the teacher. The court also reversed the assessment of 65% fault to the teacher, reasoning that no duty could have been imposed on the teacher for her to foresee the unpredictable action taken by her student.
We also reject Michael’s argument that his duty under art. 2318 was shifted to Summer Grove while MAC was at school. We find instructive this court’s treatment of a plaintiffs argument that La. C.C. art. 2320 made teachers vicariously liable for the misdeeds of students under their care:
To levy liability, as sought by plaintiff, would effectively place the teacher in the same position, vis-a-vis the student, as a parent occupies toward his child. Considering the many societal problems confronting modern education, an imposi *952 tion of liability without fault, based upon the delictual conduct of students, would further handicap present-day school systems. If threatened with almost unlimited liability, academic institutions would be forced to divert additional attention from their fundamental role as centers of learning.
Thus, public policy strongly militates against assessing a school board with vicarious liability for the delictual acts of its students.
Adams v. Caddo Parish School Bd., 25,370 at p. 9 (La.App. 2d Cir.1/19/94), 631 So.2d 70, 76, writ denied, 94-0684 (La.4/29/94), 637 So.2d 466.
Michael stated that when MAC transferred to Summer Grove, he had an entry interview with Penton and Bloomer to give them MAC’s | ^background. He recalled telling them that MAC had disciplinary problems at Evangel and had been asked to leave, although he did not think he went into detail during the interview about specifically what had led to the expulsion. Michael also did not remember if he released MAC’s records from Evangel to Summer Grove. Penton contended that when she left this meeting, she was unaware of any disciplinary issues involving MAC as she did not have his disciplinary file from Evangel. MAC was still diagnosed with ADD at the time of the interview.
MAC was prescribed the medication Ability for his bipolar disorder.[4] Michael stated that he knew he told someone at Summer Grove about the bipolar diagnosis and what medications MAC was taking because he did not want them to think he was ignoring MAC’s continuing problems at school. Michael also stated that the staff at Summer Grove knew that MAC had been treated at Brentwood because MAC returned to school with a doctor’s excuse from there. Nevertheless, Michael could not recall specifically discussing MAC’s condition or medicines with Penton.
Michael did not know if MAC was ever evaluated by the school system for special education services, and he never requested such an evaluation. MAC was never a special education student, but was in regular class.
According to Michael, the only other person injured by MAC was a school safety coordinator, who had his watch broken. MAC broke the 11fisafety coordinator’s watch while wrestling with him. He also apparently head butted the safety coordinator in the counselor’s office.
Penton testified that she referred MAC to a school counselor because of his worsening behavior. A hearing was held a week after the October 6 incident to determine whether MAC should remain at Summer Grove. Penton testified that her recommendation was that MAC be removed from the school because his bad behavior was escalating, but Bloomer told her that she wanted MAC to stay at Summer Grove because there was not an alternative school for second graders. While Penton was concerned that MAC might pose a danger to teachers and other students, she had to follow Bloomer’s recommendation since she was the principal.
Penton stated that she did not volunteer to work with MAC and was not consulted about his admission to Summer Grove. She also contended that she was not privy to any diagnoses or treatment of MAC, especially the bipolar diagnosis. She knew MAC was a continuing behavior problem, but she did not think she was placing herself into a dangerous situation when escorting him to the office based upon his *953 small size and limited information about him.
As noted earlier, Louisiana no longer recognizes assumption of the risk as a total bar to recovery. The extent, if any, of Penton’s knowledge and acceptance of risks presented by MAC would be subject to a comparative fault analysis at a trial on the merits.
|17We conclude that the trial court erred in granting the exception of no right[5] of action and motion for summary judgment and dismissing Penton’s claims against Michael and State Farm as his insurer.
DECREE
With Penton to bear her appeal costs, we affirm the judgment dismissing the claims against Kelly. With Michael and State Farm to bear their appeal costs, we reverse the judgment dismissing Penton’s claims against Michael and State Farm as his insurer, and remand the matter for further proceedings.

. MAC’s pediatrician had originally diagnosed him as having ADD.

. Bloomer and the School Board were later dismissed on summary judgment.

. It would later be determined at the trial on the merits that the child was in his father’s physical custody at the time of the fight.

. MAC'S first psychiatrist diagnosed the bipolar disorder and prescribed Ability.

. We would have found the exception of no cause of action to have been erroneously granted had it been part of the judgment.